RECEIVED
IN LAFAYETTE, LA.

JUN 1 5 2009

TONY R. MOORE, CLERK
BY
DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

| | | |
|---|---|---|
| CATHERINE PIERCE | * | CIVIL ACTION NO. 08-cv-0114 |
| VERSUS | * | JUDGE MELANÇON |
| COMMISSIONER OF SOCIAL SECURITY | * | MAGISTRATE JUDGE HILL |

## *REPORT AND RECOMMENDATION*

Before this court is an appeal of the Commissioner's finding of non-disability. Considering the administrative record, the briefs of both parties, and the applicable law, it is recommended that the Commissioner's decision be **REVERSED AND REMANDED** because the Administrative Law Judge (hereinafter "ALJ") failed to develop the record regarding claimant's ability to maintain employment and failed to explain the weight given to the opinion of claimant's treating physician.

### *Background and Procedural History*

On the date of her administrative hearing, Catherine Pierce was 43 years old (b. January 19, 1962). She has a 12th grade education and has worked in the past as a bookkeeper for a livestock company from 1996 to 2001(or 2002) and as a veterinarian's assistant from 1989 to 2005. (Tr. 503). Pierce stated at the ALJ hearing that she quit work in 2002 because she could not concentrate on her job. (Tr. 503).

On November 24, 2003, Pierce applied for disability and disability insurance benefits alleging disability as of October 27, 2001, due to hypertension, asthma, fibromyalgia,[1] and chronic fatigue syndrome (hereinafter "CFS"). (Tr. 43-45). Her claim was denied initially on April 23, 2004. Thereafter, the claimant filed a timely written request for hearing. On December 14, 2005, a hearing was held before ALJ Philip Kline. Following her administrative hearing, the ALJ submitted interrogatories to Charles Robertson, Psy.D. (Tr. 13). However, Dr. Robertson failed to respond to the interrogatories despite repeated requests. That notwithstanding, the ALJ determined that claimant was not disabled.

The Appeals Council denied review (Tr. 5), and claimant timely filed this appeal. Claimant alleges that the ALJ erred in failing to adequately develop the administrative record regarding her impairments.

### *Standard of Review*

The court's review is restricted under 42 U.S.C. § 405(g) to two inquiries: (1) whether the Commissioner's decision is supported by substantial evidence in the record; and (2) whether the decision comports with the relevant legal standards. *Carey v. Apfel*, 230 F.3d 131, 136 (5th Cir. 2000); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992); *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). Where the Commissioner's decision is supported by substantial evidence, the findings therein are conclusive and must be affirmed. *Richardson v. Perales*, 402 U.S. 389, 390, 91 S.Ct. 1420, 28 L.Ed.2d

842 (1971). The Commissioner's decision is not supported by substantial evidence when the decision is reached by applying the improper legal standards. *Singletary v. Bowen*, 798 F.2d 818 (5th Cir.1986). [2] While substantial evidence lies somewhere between a scintilla and a preponderance, substantial evidence clearly requires "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir.1991).

### Procedure for Analysis of Impairments

To be entitled to benefits under the Social Security Act, claimant must prove that she is disabled according to the specifications of the Act. *Legett v. Chater*, 67 F.3d 558, 563-64 (5th Cir. 1995); *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically-determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C.§ 423(d)(1)(a); *Anthony v. Sullivan*, 954 F.2d at 292. In determining whether a claimant is capable of performing substantial gainful activity, the Secretary uses a five-step sequential procedure set forth in 20 C.F.R. § 404.1520(b)-(f) (1992).[3]

In the instant case, at the second step, the ALJ found that claimant suffered from the following severe medically determinable impairments: hypertension, asthma, fibromyalgia, and CFS. (Tr. 14). At step three, the ALJ determined that claimant did not

have any "severe" medically determinable mental impairment under the criteria set forth in the Listing of Impairments,[4] (Tr. 15) and that she had the residual functional capacity to perform the full range of light work. Thus, at step four, the ALJ found that claimant was able to return to her past relevant work as a bookkeeper. (Tr. 20). Accordingly, the ALJ determined that claimant was not disabled and denied benefits. (Tr. 20).

## *Findings*

### 1. Relevant Medical Evidence

(a) **Records from Claimant's treating physician, Dr. Patricia Salvato,[5] of Diversified Medical Practices:** Claimant was seen by Dr. Salvato on at least 23 occasions between July, 2001 and September, 2006. Throughout these visits, Dr. Salvato's recurring assessment was that claimant suffered from chronic fatigue, headaches, insomnia, joint pain and low grade fever, among other ailments.

On July 29, 2001, claimant presented complaining of feeling fatigue for the previous three years. (Tr. 239). She also reported joint pain, frequent sore throat, swollen glands in the head and neck, low grade fever, insomnia, decreased short term memory and concentration, and frequent headaches. Her blood pressure was 120/80. (Tr. 242). Dr. Salvato's assessment was fatigue, memory disturbance, insomnia, chronic headaches, and hypertension. (Tr. 231, 234, 237, 243). Claimant complained of increased joint pain, sinus problems, muscle spasms, "brain fog," persistent sleep problems, increased loss of balance, and fever on October 24, 2001. (Tr. 230). In 2002, she reported soreness in her

entire body, IBS, GERD, fever, nose bleeds, sore ears, shortness of breath, increased cough, blurred vision, and tingling in her feet and legs. (Tr. 207, 209, 215, 221).

On February 13, 2003, claimant complained of fatigue, cough, congestion, sore joints, fevers, shakes, fever, and memory disturbance. (Tr. 203). She rated her fatigue as 7 on a scale of 1 to 10. On May 15, 2003, she reported fatigue, increased bladder spasms, increased sinus problems, increased wheezing, leg crams and pain, a foul smelling cough, vomiting, and heartburn. (Tr. 198).

Claimant complained of a rash to her face, neck, and arms, headaches, decreased concentration, intermittent chest pain, and increased sinus and ear pain, on December 29, 2003. (Tr. 186). The assessment was fatigue, chronic headaches, insomnia, gastro-esophageal reflux disease (hereinafter "GERD"), irritable bowel syndrome (hereinafter "IBS"), and attention deficit. (Tr. 188).

On March 29, 2004, claimant complained of increased muscle pain, back pain, fatigue, bloating, earaches, and wheezing. (Tr. 398). She rated her fatigue as 8 on a scale of 1 to 10. The assessment was fatigue, chronic headaches, insomnia, GERD, IBS, and attention deficit. (Tr. 400). She was prescribed Ambien and Bextra. (Tr. 401).

On June 30, 2004, claimant reported increased fatigue, sweats, falling, back/neck pain, memory disturbance, and moodiness. (Tr. 394). She rated her fatigue as 12 on a scale of 1 to 10. Her diagnosis was fibromyalgia. (Tr. 396). She was prescribed

Zelnorm, Ambien, Neurontin, Nexium, and Bextra. (Tr. 397). She had a new complaint of low grade fever on September 28, 2004. (Tr. 393).

On December 30, 2004, claimant complained of persistent sinus problems, low-grade fever, leg pain, chest heaviness, fatigue, weakness, knots in her neck and shoulder, and swollen ankles. (Tr. 382). She had 18 out of 18 tender points on examination. (Tr. 383).

On March 31, 2005, claimant added complaints of rash, itching, falls, stiffness, and insomnia. (Tr. 378). She had swollen glands and 12 out of 18 tender points on examination. (Tr. 378-79). Her back and neck pain were worse on June 30, 2005. (Tr. 374). She also complained of increased fever and knots in her neck, persistent "fluid holding," swollen lymph glands, and shortness of breath. (Tr. 362, 366).

In December of 2005, and again in the spring of 2006, claimant visited Dr. Salvato's office several times complaining of severe headaches, swollen lymph nodes, muscle pain, joint pain, back pain, earache and wheezing. She also had jaw pain. (Tr. 494). Dr. Salvato noted that on March 22, 2006, claimant's symptoms were no better and that in fact, claimant was experiencing persistent sleep disturbance, increased fluid retention, and worsening joint pain, especially in the hips. (Tr. 494). Additionally, claimant described new onset lower back pain, fluid in the ears, cough, bronchitis, and intermittent fevers. At a follow-up appointment on June 21, 2006, claimant presented with swollen lymph nodes, nonexudative pharyngitis, dysuria, frequency, nocturia, and

pain from the hips down. Claimant's lab work continued to show low levels to ATP which is the energy store in every muscle. (Tr. 494).

Dr. Salvato concluded on September 5, 2006, that claimant had had a 50% decrease in her ability to perform her daily activities. (Tr. 494-95). She opined that claimant had difficulty concentrating because of her pain and fatigue and that her symptoms were unrelieved by rest. She further found "that [claimant] is unable to maintain any steady activity, and it continues to be my opinion that [claimant] is totally disabled from any gainful employment."

**(b) Chronic Fatigue Syndrome Residual Functional Capacity ("RFC") Questionnaire by Dr. Salvato dated November 21, 2005**: Dr. Salvato reported that claimant had CFS, fibromyalgia, and hypertension and that her prognosis was guarded. (Tr. 419). Dr. Salvato further reported that claimant had all of the following symptoms of CFS: sore throat, tender lymph nodes, muscle pain, multiple join pain without swelling or redness, headaches, unrefreshing sleep, and post-exertional malaise lasting more than 24 hours. Dr. Salvato stated that these medical signs of the illness had persisted or recurred during six or more consecutive months of illness. (Tr. 420). Dr. Salvato did not note that any laboratory findings were present to support her diagnosis.

Claimant also had mental findings related to CFS, including short-term memory deficit and concentration limitations. (Tr. 421). Her medications included Neurontin,

7

Benadryl, Lasix, Zelnorm, Nexium, Premarin, Vytorin, Restoril, Lotensin HCT, and Combivent inhaler. Dr. Salvato reported that claimant was not a malingerer.

Dr. Salvato opined that claimant frequently experienced fatigue or other symptoms which were severe enough to interfere with attention and concentration needed to perform even simple work tasks. (Tr. 422). She stated that claimant was incapable of even "low stress" jobs, because prolonged stress, emotional or physical, exacerbated her symptoms. She stated that the onset of claimant's symptoms occurred on July 25, 2001 at the initial visit.

As to limitations, Dr. Salvato stated that claimant could walk less than one block without rest. She reported that claimant could sit for 15 to 20 minutes at one time. She noted that claimant could stand for 10 to 15 minutes at a time. She checked that claimant could sit, stand/walk for less than two hours in an eight-hour working day.

Additionally, Dr. Salvato opined that claimant needed a job which permitted shifting positions at will from sitting, standing, or walking. (Tr. 423). She also noted that claimant would need to take unscheduled breaks after every one hour of activity, including sedentary activity. She stated that claimant could occasionally lift less than 10 pounds, rarely lift 10 pounds, and never lift 20 to 50 pounds.

Dr. Salvato checked that claimant could occasionally twist, and rarely stoop, crouch, or climb ladders and stairs. She had significant limitations in doing repetitive reaching, handling, or fingering.   Her impairments were likely to produce "good days"

8

and "bad days." (Tr. 424). Dr. Salvato estimated that claimant was likely to be absent from work as a result of her impairments more than four days per month.

**(c) Consultative Examination by Dr. Deidra Parrish dated April 10, 2004.**
Claimant complained of chronic fatigue, mental confusion, immune dysfunction, and irritable bowel syndrome with constipation. (Tr. 248). She could dress and feed herself, stand between 30 minutes to one hour at a time, walk about 150 feet on level ground, sit for five to ten minutes, lift about five pounds with the left arm and about a pitcher of tea with the right, drive without difficulty, cook, and do the dishes. However, she reported that she was unable to mop, vacuum, grocery shop, climb stairs, or mow grass.

Claimant's medications included Nexium, Ambien, Neurontin, Lasix, Lotensin/HCT, Estratest, Zelnorm, Bextra, Detrol, and Albuterol. (Tr. 249). She complained of headaches every other day which "go away on their own" and wheezing about 15 days a month in the spring and fall when her asthma and bronchitis acted up. She reported having internal hemorrhoids and chronic cystitis. She had also had an episode of hematuria[6] seven months prior to Dr. Parrish's exam.

On examination, claimant's height was 68 ½ inches and weight was 188 pounds. Her blood pressure was 110/70. She ambulated well without an assistive device. She was able to transfer from the chair to standing to the examination bed with no problems. Claimant's skin was normal; no rashes, cyanosis, jaundice or clubbing were present. (Tr.

9

250). Additionally, her neck, lungs, heart, and abdomen were found to be regular. Regarding spine and extremities, pulses were 2+ with bilateral pedal pulses. (Tr. 250). Claimant had no lower extremity edema, and her gait was normal.

Claimant's muscle strength was 5/5 in the upper and lower extremities and grip strength was 5/5. Claimant's normal fine and gross manipulations were normal. Claimant had no atrophy or deformity of any muscle group. Range of motion of all joints was normal. Her cranial nerves were intact.

Dr. Parrish's impression was hypertension, well-controlled; asthma/bronchitis, well-controlled; and a history of fibromyalgia. She noted that claimant had no objective musculoskeletal abnormalities on examination. She stated that claimant did not require an assistive device for ambulation.

**(d) Consultative Report from Charles M. Robertson, Ph.D., dated March 15, 2006.** Claimant presented with a complaint of CFS. (Tr. 455). She reported worsening pain in her cervical and thoracic spine, with range of pain from 5 to 9 on a scale from 1 to 10. She stated that her pain was exacerbated by sitting or standing too long. Her symptoms included insomnia, declining energy, variable appetite, and difficulties with memory. She was able to drive, shop, bank, cook, read, and write. (Tr. 456).

On examination, claimant was alert and fully oriented. She was able to maintain attention and concentration. Speech productions were normal, logical, and coherent. She was able to follow a three-stage command.

Claimant's mood was generally sad, and her affect was appropriate to her mood. (Tr. 457). Her intellect was estimated to be average. Her judgment and insight were fair.

Dr. Robertson noted that claimant's test results reflected considerable worry about health and a tendency to convert psychological stress into physical symptoms and complaints. (Tr. 457). Dr. Robertson concluded that claimant's clinical presentation suggested the presence of a chronic pain disorder associated with physical and psychological features. He also found that she had moderate stress from chronic pain. (Tr. 458). Her Global Assessment of Functioning ("GAF") score was 55 for the previous year. The Medical Source Statement in the record is somewhat illegible, but it appeared that claimant had no apparent psychological limitations. (Tr. 459-460).

**(e) Records from Richard E. Landry, MD, FAFP**: Dr. Landry saw claimant numerous times between the summer of 1999 and June 28, 2005; she presented with high blood pressure, headaches, fatigue, left otitis media, pharyngitis, fluid retention, reflux gastritis, swelling in the feet, cough, congestion, fever, bronchitis, rash, sore throat, joint pain, and memory loss. (Tr. 427, 452-53). In March 2000, Dr. Landry prescribed Aciphex for reflux, Lasix for blood pressure, and Antalgic D for congestion. In November 2000, claimant presented with lingular pneumonia and was prescribed Augmentin.

Upon Dr. Landry's orders, claimant underwent a Complete Blood Count ("CBC") screening at Clinical Pathology Labs on June 28, 2005, the results of which were within normal ranges. (Tr. 441). On July 7, 2005, claimant was admitted to Southern Home Health Services for home health care to treat exacerbation of chronic sinusitis and received IV antibiotic therapy upon orders from Dr. Landry. (Tr. 357, 359). Her pain on a scale of 1 to 10 was a 3 or 4. (Tr. 340). She had a history of chronic sinusitis, hypertension, chronic fatigue syndrome, and poor venous access. She was instructed to cut back or quit smoking, but she was very dismissive of this advice and continued to smoke one and a half to two packs of cigarettes per day. On August 12, 2005, she was discharged.

**(f) Records of Dr. Fred J. Brassier[7], dated October 1, 2001 to May 26, 2005.** On October 1, 2001, claimant was referred by Dr. Patricia Salvato to Dr. Brassier for evaluation of chronic rhino sinusitis. Claimant presented with no signs of distress at her initial visit (Tr. 98). Dr. Brassier saw claimant nine times between 2001 and 2005. Dr. Brassier's impression was chronic rhino sinusitis with allergy, nasal airway obstruction, compensatory inferior turbinate hypertrophy, and otitis media with effusion. (Tr. 99, 254). He recommended topical nasal therapy with Astelin and three-times daily antibiotics topically applied with a mucosal atomizer device. He also suggested an allergy consultation for allergy testing. (Tr. 254).

On May 26, 2005, Dr. Brassier reported that claimant's CAT scan showed her paranasal sinuses as negative. (Tr. 253, 256-57). Examination revealed a septal deviation to the right and turbinate hypertrophy. (Tr. 253). No evidence of infection was noted. He recommended continued Clarinex, Bactroban, and saline therapy. In his opinion, claimant did not require sinus surgery. His notes state that claimant smoked one and a half packs of cigarettes per day. (Tr. 252).

**(g) Records from Dr. Stanley R. Kordisch, F.A.C.O.G.[8], dated April 24, 2001 to July 5, 2005.** Claimant presented to Dr. Kordisch on December 10, 2001 complaining of chronic lethargy and fatigue. (Tr. 274). Dr. Kordisch's impression was chronic fatigue. Dr. Kordisch ordered an Epstein-Barr Antibody Panel which was taken on May 22, 2001; the test was positive with respect to the Viral Capsid antigen and EBNA panels.[9] (Tr. 277). The results of claimant's blood tests completed on May 15, 2001 and May 21, 2001 were all normal. (Tr. 279). Her colonoscopy exam on September 27, 2004 revealed no abnormalities other than hemorroids.

**(h) Records from W. Calcasieu Cameron Hospital dated August 18, 2003 to July 27, 2005.** On August 18, 2003, claimant presented with headaches. (Tr. 332). An MRI of the brain was normal. On July 1, 2004, claimant complained of right sided weakness. (Tr. 324). An MRI showed central stenosis at C5-6 due to prominent disc osteophyte complex, possibly resulting in minimal cervical spinal cord impingement at

that level. (Tr. 325). Facet degenerative changes with disc dessication were noted at the L4-5 level. (Tr. 326).

(i) **Records from Dr. Terry R. Williams[10] dated September 9, 2003 to May 27, 2004.** Claimant saw Dr. Williams in Houston six times complaining of supra pubic pain, cramps, and discomfort. Dr. Williams found claimant to be "feeling fine" with no fever, chills, flank pain, bone pain, weight loss or hematuria. (Tr. 287). Claimant's urinalysis tests in November, 2003 and in May, 2004 were negative.

(j) **Diagnostic Report from Dr. Paul Sumita[11] dated July 29, 2005.** A left upper extremity venous duplex study showed an enlarged lymph node in the axillary fossa. (Tr. 336). The impression was no evidence of acute deep vein thrombosis and no loss of competence of the venous valves.

## 2. **Testimonial Evidence**

At the administrative hearing on December 14, 2005, claimant testified that she was 43 years old and that she had graduated from high school and had also studied bookkeeping. Claimant's past employment history includes working as a bookkeeper from 1996 to 2002. (Tr. 502-3). Additionally, she worked as a veterinarian assistant at a clinic from 1989 to 2005. Claimant testified that she quit working in 2002 because she could not concentrate on her job due to CFS. (Tr. 503-504).

Claimant's complaints included: irritable bowel syndrome, frequent sinus and kidney infections, pneumonia, chronic sinusitis, reflux, fibromyalgia, interstitial cystitis,

high blood pressure, chronic bronchitis, asthma, headaches, weekly sore throats, back problems, pinched vocal chord in her back and neck. (Tr. 504-507). In addition, she complained of an inability to concentrate and chronic tiredness. (Tr. 506, 510). She reported that she was diagnosed with the Epstein-Barr virus in 2001.

As to chronic fatigue, claimant complained that she was constantly tired to the point of exhaustion but had trouble sleeping. (Tr. 508). She also experienced flu-like symptoms every other day. She testified that on a good day, she could run short errands such as going to the grocery store and could also wash clothes, sweep, mop and prepare meals. (Tr. 509, 512). Claimant rated her fatigue after 1999 as 8 on a scale of 1-10. (Tr. 517).

Regarding activities, claimant testified that she fished occasionally and attended church weekly. (Tr. 511). She also had visiting friends at her home once every two weeks. (Tr. 514). On a bad day, claimant stated that she was unable to leave the recliner other than to use the restroom or to get a glass of water. She further stated that she had more bad days than good. (Tr. 509).

As to limitations, claimant testified that she could only stand for 45 minutes to an hour and then had to sit for awhile. (Tr. 515). After sitting for an hour, claimant became stiff. She stated that she was unable to lift anything heavier than a cooking pot. (Tr. 516). She could drive a distance of 30 miles approximately once a month. Witness Ronnie Pierce confirmed claimant's testimony as accurate. (Tr. 519).

***Analysis***

## 1. <u>Weight Given by ALJ to Treating Physician's Opinions</u>

In this case, claimant alleges in her statement of errors that the ALJ failed to adequately develop the administrative record regarding her impairments.[12] Claimant's long-term treating physician, Dr. Salvato, reported that claimant had all of the medical symptoms of CFS and that her symptoms had persisted or recurred during six or more consecutive months of illness. (Tr. 420). Claimant also had mental findings related to CFS, including short-term memory deficit and concentration limitations. (Tr. 421) Dr. Salvato reported that claimant was **not** a malingerer and frequently experienced fatigue or other symptoms which were severe enough to interfere with attention and concentration needed to perform even simple work tasks. (Tr. 422, emphasis added). She stated that claimant was incapable of even "low stress" jobs because prolonged stress, emotional or physical, exacerbated her symptoms.

The ALJ is entitled to determine the credibility of the examining physicians and medical experts and to weigh their opinions accordingly. *Greenspan*, 38 F.3d at 237. The testimony of the treating physician must be given substantial weight unless "there is good cause shown to the contrary." *Smith v. Schweiker*, 646 F.2d 1075, 1081 (5th Cir. 1981). The weight to be given a physician's statement is dependent upon the extent it is supported by specific clinical findings. *Elzy v. Railroad Retirement Board, 782 F.2d 1223, 1225 (5th Cir. 1986); Jones v. Heckler, 702 F.2d 616, 621 (5th Cir. 1983).* An acceptable medical

opinion as to disability must contain more than a mere conclusory statement that the claimant is disabled. It must be supported by clinical or laboratory findings. *Oldham v. Schweiker, 660 F.2d 1078, 1084 (5th Cir. 1981).* The ALJ is required to give substantial weight to the doctors' medical findings, not to their opinions about the actual availability of work for a person. *Loya v. Heckler, 707 F.2d 211, 214 (5th Cir. 1983).*

In *Newton v. Apfel,* 209 F.3d 448 (5th Cir. 2000), the Fifth Circuit held "that, absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician **only if** the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2)." *Id.* at 453 (emphasis in original). The Social Security Regulations set forth the following six factors which **must** be considered by the ALJ before giving less than controlling weight to a treating physician's opinions: (1) length of the treatment relationship; (2) frequency of examination; (3) nature and extent of the treatment relationship; (4) the supportability of the physician's opinion afforded by the medical evidence in the record; (5) the consistency of the opinion as a whole; and (6) the specialization of the physician. Even when a physician's opinion does not meet the test for controlling weight, it is still entitled to deference, and in many cases should still be accorded the greatest weight. *Newton,* 209 F.3d at 456; *see also Loza,* 219 F.3d at 395.[13]

Here, the ALJ failed to adequately address the requirements for rejecting the treating physician's opinion as set forth in *Newton* because he did not consider the following factors: (1) length of treatment relationship; (2) frequency of examination; (3) nature and extent of the treatment relationship; (4) specialization of physician (if any). Because the ALJ did not fully address the requirements necessary to discount the treating physician's testimony, the decision of the ALJ cannot stand. The ALJ and the Commissioner committed reversible error by failing to accord "great weight" to the medical reports of the treating physician and by not explaining his failure to do so.

## 2. Ability to Sustain Employment

A finding that a claimant is able to engage in substantial gainful activity requires more than a simple determination that the claimant can find employment and that she can physically perform certain jobs; it also requires a determination that the claimant can hold whatever job she finds for a significant period of time." *Watson v. Barnhart*, 288 F.3d 212, 217-218 (5th Cir. 2002), *citing Singletary v. Bowen*, 798 F.2d 818, 822 (5th Cir. 1986). Further, the ability to work only a few hours a day or to work only on an unpredictable or intermittent basis does not constitute the ability to engage in "substantial gainful activity." *Tucker v. Schweiker*, 650 F.2d 62, 64 (5th Cir. 1982); *Cornett v. Califano*, 590 F.2d 91, 94 (4th Cir. 1978); *Prestigiacomo v. Celebrezze*, 234 F.Supp. 999 (E.D. La. 1964).

Here, the ALJ erred in failing to determine whether claimant was capable not only of obtaining employment, but also maintaining it. *Watson*, 288 F.3d at 218. Claimant's long-time treating physician, Dr. Salvato, indicated that claimant would be unable to sustain employment, in part because she estimated that claimant was likely to be absent from work as a result of her impairments more than four days per month. Dr. Salvato opined that claimant would need a job which permitted shifting positions at will from sitting, standing, or walking. (Tr. 423). She also noted that claimant would need to take unscheduled breaks after every one hour of activity, including sedentary activity. She stated that claimant could occasionally lift less than 10 pounds, rarely lift 10 pounds, and never lift 20 to 50 pounds. Dr. Salvato's final determination was "that [claimant] is unable to maintain any steady activity, and it continues to be my opinion that [claimant] is totally disabled from any gainful employment." (Tr. 495).

## CONCLUSION

After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is not substantial evidence in the record to support the Commissioner's finding that the claimant was not disabled. Because I find that the ALJ failed to fully explain the weight given to the opinion of claimant's treating physician, Dr. Salvato, and thus erred in finding that claimant had the ability to maintain employment, I recommend that this matter be **REVERSED and REMANDED**

for further proceedings pursuant to 42 U.S.C. § 405(g) and in accordance with these findings. This includes, but does not limit, sending the case to the hearing level with instructions to the Administrative Law Judge to develop the record regarding claimant's ability to maintain employment and to explain the weight given to the opinion of claimant's treating physician. Claimant shall be afforded the opportunity to submit additional evidence and to testify at a supplemental hearing.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN TEN (10) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON**

**GROUNDS OF PLAIN ERROR.** *DOUGLASS V. UNITED SERVICES*

*AUTOMOBILE ASSOCIATION,* **79 F.3D 1415 (5TH CIR. 1996).**

Signed this ⟋⟋ day of June, 2009, at Lafayette, Louisiana.

C. Michael Hill
U.S. Magistrate Judge

---

[1] Fibromyalgia is a chronic disorder characterized by widespread pain, tenderness and stiffness of muscles and associated connective tissues that is typically accompanied by fatigue, headache and sleep disturbances. *www2.merriam-webster.com.*

[2] Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Carey,* 230 F.3d at 136; *Anthony,* 954 F.2d at 292; *Carrier v. Sullivan,* 944 F.2d 243, 245 (5th Cir. 1991). The court may not re-weigh the evidence in the record, nor substitute its judgment for that of the Commissioner, even if the preponderance of the evidence does not support the Commissioner's conclusion. *Carey,* 230 F.3d at 136; *Johnson v. Bowen,* 864 F.2d 340, 343 (5th Cir. 1988). A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the decision. *Johnson,* 864 F.2d at 343.

[3] The procedure is as follows:
1. If a person is engaged in substantial gainful activity, he will not be found disabled regardless of medical findings.
2. A person who does not have a "severe impairment" will not be found to be disabled.
3. A person who meets the criteria in the list of impairments in Appendix 1 of the regulations will be considered disabled without consideration of vocational factors.
4. If a person can still perform his past work, he is not disabled.
5. If a person's impairment prevents him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed.

[4] The ALJ found that claimant's impairments were not significant enough to equal one of the impairments listed in *20 C.F.R. Part 404, Subpart P, Appendix 1.*

[5] Internal Medicine physician

[6] Hematuria is the presence of red blood cells in the urine. *www2.merriam-webster.com.*

[7] Board Certified Facial Plastic Surgeon

[8] Gynecology and Infertility physician

[9] "If antibodies to both the viral capsid antigen and EBNA are present, then past infection (from 4 to 6 months to years earlier) is indicated. Since 95% of adults have been infected with EBV, most adults will show antibodies to EBV from infection years earlier. High or elevated antibody levels may be present for years and are not diagnostic of recent infection." http://www.cdc.gov/icidod/diseases/ebv.htm.

[10] Urologist

[11] Cardiologist

[12] Plaintiff's brief at p. 6.

[13] "The ALJ is not at liberty to make a medical judgment regarding the ability or disability of a claimant to engage in

21

gainful activity, where such inference is not warranted by clinical findings."